

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

FILED

OCT - 4 2002

CLERK, U.S. DISTRICT COURT

JASON JEROME WILLIAMS, )
)
    Petitioner, )
)
    -vs- )
)
JANIE COCKRELL, Director )
Texas Department of Criminal Justice – )
Institutional Division, )
)
    Respondent. )

**2 - 0 2 C V - 0 2 8 6 J**

## **APPLICATION FOR WRIT OF HABEAS CORPUS**

JASON JEROME WILLIAMS, an indigent prisoner now incarcerated in Roach Prison in

Childress, Texas, petitions this Court to issue a writ of habeas corpus, pursuant to 28 U.S.C. 2241,

2254 et. seq., on the grounds that his conviction and sentence were obtained in violation of his

constitutional rights under the Fifth, Sixth, and Fourteenth Amendments of the United States

Constitution. In support of his Petition, Mr. Williams states the following:

### **INTRODUCTION**

1.  On the morning of July 23, 1999, 46 women and men were arrested in Tulia, Texas for

allegedly dealing drugs to one police officer, an undercover agent named Tom Coleman. Tulia's

population is 5,000 people. Forty of those arrested were African-American, from a total black

population of less than 500 persons.  The remainder had bi-racial children, or had other close social

1

or marital ties to the African-American community.  Agent Coleman had spent the preceding eighteen months in Swisher County, allegedly making buys almost exclusively from African- Americans in Tulia.

1b.     Since Mr. William's trial, the credibility, trustworthiness, and reliability of the prosecution's star witness – the only witness providing any inculpatory information whatsoever – has been seriously tainted.  There is now clear evidence that Coleman both misidentified defendants and fabricated evidence against other defendants who were arrested as a part of the same "sting" as Mr. Williams.  On April 9, 2002, District Attorney McEachern dismissed the charge against Tulia "sting" arrestee Tonya White after her defense counsel presented him with a bank record showing Ms. White to have made a transaction from a bank in Oklahoma at the time Coleman alleged she was selling him 1.3 grams of powder cocaine in Tulia, more than 300 miles away.  Another defendant, Billy Don Wafer, also proved that Coleman's allegations against him were false.  Wafer had employee time sheets to establish that he was at work at the time that Coleman alleged he was selling the undercover agent drugs.  Additionally, the district attorney dismissed the case of Yul Bryant after it was discovered that Coleman had described Bryant as being "a tall black man with bushy type hair wearing a white t-shirt and black jogging pants" when Bryant is actually 5'6" and bald.  Recent findings of inconsistencies and impossible scenarios in Coleman's incident reports further mark his investigation and his reliability as highly questionable.

1c.     Prior to this assignment, Coleman had never been an undercover agent and had a well-documented checkered and troubled history as a law enforcement officer in other Texas counties. This history figures prominently in this proceeding and is summarized below.

## STATEMENT OF THE CASE

### 1. Statement of Prior Proceedings

2.  Mr. Williams, an African American male, was one of the forty-six women and men who allegedly sold drugs to Agent Coleman.

3.  On July 20, 1999, Mr. Williams was charged with four separate counts:

Count 1 –    Delivery of a Controlled Substance, cocaine, alleged to have occurred on or about September 3, 1998 in an amount of one gram or more, but less than four grams. (Clerk's Record (CR) at 2).

Count 2 –    Delivery of a Controlled Substance, cocaine, alleged to have occurred on or about April 19, 1999 in an amount of one gram or more, but less than four grams. (CR at 2).

Count 3 –    Delivery of a Controlled Substance, cocaine, alleged to have occurred on or about April 22, 1999 in an amount of one gram or more, but less than four grams within 1,000 feet of a playground. (CR at 2).

Count 4 –    Delivery of a Controlled Substance, cocaine, alleged to have occurred on or about May 5, 1999 in an amount of one gram or more, but less than four grams within 1,000 feet of a playground. (CR at 2).

4.  On the date of the alleged first transaction, Agent Coleman allegedly drove to Alberta Williams' home with Tulia resident Eliga Kelly[1] (Reporter's Record (RR), Vol. 2 at 116-17). Upon discovering that Ms. Williams was not at home, Agent Coleman allegedly met and asked Mr. Williams

---

[1]Eliga Kelly is an African-American resident of Tulia who befriended Tom Coleman and allegedly acquainted Coleman with members of Tulia's black community.

for drugs, and Mr. Williams allegedly sold him a baggie containing less than four grams of cocaine and received $110 (RR, Vol. 2 at 117). Agent Coleman allegedly identified Mr. Williams as the seller after Mr. Kelly identified Mr. Williams. Thereafter, Coleman allegedly called the Sheriff's Department and asked the identification assistant, Linda Swanson, for a photo of a Jason Jerome Williams (RR, Vol. 2 at 147-49). Agent Coleman then allegedly went to the Sheriff's Department and made a positive identification (RR, Vol. 2 at 147-49). According to the Agent's modus operandi that he used in many of the transactions, he allegedly put the drugs in his sock and wrote on his leg the name, time, date, and price of the alleged transaction (RR, Vol. 2 at 119). He would leave one leg and sock free for a potential second transaction later in the day (RR, Vol. 2 at 120). He then allegedly drove to the Amarillo Police Department (APD) to test the substance himself using a Valtox test kit, fill out an evidence tag, and deposit the drugs into then APD vault (RR, Vol. 2 at 121). In this case, at some point after depositing the drugs into the APD vault, he allegedly filled out an offense form and reported that he bought the drugs from a black male at 514 E. Broadway (RR, Vol. 2 at 125). He did not identify Mr. Williams as the seller in this initial report.

5. The alleged identification of Mr. Williams in the second, third, and fourth transactions were all based on this initial identification, and only substantively varied in terms of the alleged place of the transactions (the third and fourth occurred in a zone in which allowed for a significant sentence enhancement), date, quantity, and price – though each alleged transaction was for less than four grams of cocaine (RR, Vol. 2 at 149).

6. Mr. Williams was represented at trial by Kregg Hukill, an attorney appointed by the trial court, from Olton, Texas. In each of the four cases, Mr. Hukill filed a Motion for Production of

Evidence Favorable to the Accused, commonly known as a *Brady* Motion.    (CR at 14-16).

Specifically, Mr. Hukill requested information favorable to his client, including "any information

which may tend adversely to effect the credibility of any person called as a witness by the State,

including the arrest and/or conviction record of each State witness. . . ."(CR at 12-13).  The Court

granted the motion at a pretrial hearing on January 3, 2000 (Supplemental Reporter's Record (Supp.

RR) at 10). Mr. Hukill also filed a Motion to Change Venue (CR at 58-69, 93-95) which was heard

on January 12, 2000, and overruled on January 13, 2000 (RR, Vol. 3 at 108). Mr. Hukill did not file

a Motion to Sever; instead, he and the district attorney, Terry D. McEachern, stipulated to a trial

consolidating the indictments (RR, Vol. 1 at 8). On January 11, 2000, another defense attorney,

Angela French, conducted voir dire in another "sting" case – that of Christopher Eugene Jackson. Mr.

Hukill was unable to attend that voir dire (RR, Vol. 2 at 42).  The venire members present for voir dire

in Mr. Williams's trial were mostly the same as those present in Mr. Jackson's voir dire (except, of

course, the venire members who served as jurors in Mr. Jackson's case), and only "a couple of others"

were new (RR, Vol. 2 at 42).  On January 14, 2000, after a jury trial at which Agent Coleman was the

key prosecution witness,[2] Mr. Williams was convicted of the four separate counts.

---

[2] The district attorney himself repeatedly emphasized that Coleman was the prosecution's key witness against Mr. Williams:

> DA:    Where you only got one witness. And you have to rely upon that witness, so you have to look at the credibility. Does it make sense? I personally think you couldn't do what Tom Coleman did and go into the pits with the snake. But if I can find Certified Peace Officers in good standing with the State of Texas to do it, I'll do it. (RR, Vol.2 at 211).

The district attorney further implies that not believing the testimony would automatically mean that the jury would be voting for a "not guilty" verdict:

> DA:    Now, you have a choice to chose [sic] to disbelieve the total testimony of Tom Coleman. And if you chose [sic] to do that, then so be it. Find him [Mr. Williams] not guilty. (RR., Vol. 2 at 211).

7. Mr. Williams received a separate sentence for each count. On Count 1, he was sentenced to two years in the Texas Department of Criminal Justice Institutional Division (TDC), suspended for a period of two years, and a fine of $1,000.00 (CR at 149-154; RR Vol. 2, at 219, and Vol. 3 at. 72-73, 76-77). On Count 2, he was sentenced to eight years in TDC and a fine of $2,000.00 (CR at 146-149; RR Vol. 2 at 219, and Vol. 3 at 74-75, 78). On Count 3, Mr. Williams was sentenced to twenty-five years in TDC and a fine of $4,500.00 (CR at 155-158; RR Vol. 2 at 219, and Vol. 3 at 73, 77). On Count 4, he was sentenced to forty-five years in TDC and a fine of $5,000.00 (CR at 156-159; RR Vol. 2 at 219, and Vol. 3 at 73-74).

8. Subsequent to Mr. Williams's trial, but pending the adjudications of the other women and men arrested as part of Agent Coleman's sting, national media attention focused on Agent Coleman and his policing methods, and uncovered significant information about Agent Coleman's background that was never disclosed to Mr. Williams. While Mr. Williams had filed a Notice of Appeal on January 14, 2000, he withdrew his appeal and filed a Motion for New Trial (CR at 162-163) and argued that *Brady* evidence was not disclosed to Mr. Williams's counsel prior to or during trial.

9. Prior to the hearing on the motion, Mr. Hukill attempted to subpoena the employment records and job application of Mr. Coleman (CR at 177). The motion was denied after a hearing on March 22, 2000 (RR, Vol. 3 at 107-108) during which Judge Self granted the district attorney's motion to quash the subpoenas, declaring as a matter of law that the sought-after information did not constitute *Brady* material.

10. Mr. Williams then again filed another timely Notice of Appeal on April 4, 2000 (CR at 194). On July 28, 2000, Mr. Hukill filed an *Anders* brief, *see Anders v. California*, 386 U.S. 738

(1967), and asserted he found no viable issues to present on appeal. In the body of this brief, he identified the *Brady* claim and stated that the convicting court was in error in denying this claim in the motion for new trial. The Seventh Court of Appeals in Amarillo, Texas issued its mandate affirming Mr. Williams's convictions and sentences on January 8, 2001.

10a.   On January 7, 2002, Mr. Williams, through new counsel, sought state post-conviction relief. He also moved for discovery and an evidentiary hearing. No discovery or hearing was held, and on September 25, 2002, the Texas Court of Criminal Appeals issued a postcard denial of his petition.[3]

### 2.  Facts Concerning Agent Coleman That Were Not Disclosed to Williams

11.   Prior to Mr. Williams's January, 2000 trial, the prosecution disclosed no *Brady* information concerning Agent Coleman. Today, a great deal more is known about Coleman's law enforcement career, his character, and tactics – facts that were known to Swisher County law enforcement officials at the time of Mr. Williams's trial but which were not disclosed to him. We summarize that material below.

12. Agent Coleman held two positions in law enforcement prior to being hired by Swisher County in 1998. He served as a deputy sheriff in Cochran County from 1994 to 1996, and as a deputy sheriff in Pecos County from 1989 to 1994. He was terminated from each job because of acts unbecoming to a law enforcement officer. Coleman's unsatisfactory work history prompted former Cochran County Sheriff Kenneth Burke to inform the Texas Commission on Law Enforcement Officer

---

[3] Counsel for Mr. Williams did not receive a copy of said Order until today, October 3, 2002.

Standards and Education (TCLEOSE), the state agency that licenses peace officers, that: "It is in my opinion that an officer should uphold the law. Mr. Coleman should not be in law enforcement if he is going to do people the way he did this town."

    a.    **Pecos County: Coleman had a reputation among law enforcement for being untrustworthy and unable to comply with rules**

13. Evidence in Agent Coleman's background that suggested he was neither trustworthy nor credible begins with his first law enforcement job. While employed at the Pecos County Sheriff's Department, Coleman and his wife Alice Carol Barnett divorced. During these proceedings, a court-appointed investigator reached the conclusion that Agent Coleman had a reputation for being untrustworthy. Pecos County deputy Rick Kennedy agreed and once stated that "Tom can lie to you when the truth would sound better." Nina McFadden, wife of another of Agent Coleman's former co-workers in Pecos County, described Coleman as "paranoid" and a "compulsive liar." Another fellow officer from Pecos County found Coleman to be unstable and untrustworthy. "He was a nut. He was very paranoid." *See* Nate Blakeslee, *Color of Justice*, THE TEXAS OBSERVER, Jun. 23, 2000 at 13. According to Pecos County chief deputy Cliff Harris, Agent Coleman accidentally shot out the windshield of his own patrol car with a shotgun, while he was seated in it, *see* Nate Blakeslee, *Color of Justice*, THE TEXAS OBSERVER, Jun. 23, 2000 at 13, and the Bureau of Alcohol Tobacco and Firearms confiscated an illegal automatic rifle from Coleman (Coleman Depo. at 14).[4] Both McFadden and Bobby Harris, another former associate in Pecos County, recalled that Coleman warned them that his house was always booby-trapped when he was out-of-town.

---

[4]Citations to deposition testimony in this Application refer to depositions conducted in *Billy Don Wafer v. Swisher County, Texas et al.,* Cause No. 2-01CV-0079J.

14. The divorce proceedings further highlighted Coleman's apparent inability to comply with rules, even when ordered to do so by a court. When Coleman's parental rights were terminated, he owed $5000 in back pay of court-ordered child support (Coleman Depo. at 20). Ms. Barnett, Coleman's ex-wife, ultimately filed a motion to compel payment (Coleman Depo. at 20). The Attorney General's Office intervened, and asked Coleman's employer to garnish Coleman's child support dues out of his monthly paycheck (Coleman Depo. at 20 - 21).

15. According to Ms. Barnett, their divorce caused Coleman to crack. *See* Nate Blakeslee, *Color of Justice*, THE TEXAS OBSERVER, Jun. 23, 2000 at 13. Coleman's stint in Pecos County ended when he left his patrol car at his house, pawned a gun for gas money, and left town.

16. More recently, Swisher County Sheriff Stewart concluded that such instances demonstrate untrustworthiness and lack of integrity (Stewart Depo. at 36-41), and that trust and integrity are integral to the job of an undercover officer whose official activities are uncorroborated (Stewart Depo. at 18).

**b.** **Cochran County: Coleman's untrustworthiness and lack of credibility led ultimately to criminal charges and a supervisor's letter that Coleman should not be in law enforcement**

17. After a brief stint as a jailer in Denton County, Coleman moved back to West Texas to serve as a patrol deputy in Cochran County under Sheriff Kenneth Burke (Coleman Depo. at 28). While in Cochran County, he resided with Carla Bowerman, and falsely presented her to other Cochran neighbors as his wife (Coleman Depo. at 40). Coleman worked in Cochran County for one year, and claims to have left for a better job (Coleman Depo. at 61). However, Coleman resigned from Cochran County in the middle of a shift (Coleman Depo. at 41). He left his patrol car fourteen miles out of town, walked into the dispatcher's office in the middle of his shift and told her that he was quitting (Coleman Depo. at 41).

18. Coleman alleges that he first learned that Cochran County residents were accusing him of skipping town without paying back debts owed when he tried to apply for a job at the Odessa Police

9

Department in October or November of 1997.[5]   The Odessa Police Department informed Coleman that it could not hire him because of his reputation in Cochran County and because he had stolen gas for personal use under the pretense of buying it for his patrol car (Coleman Depo. at 50-51).   In fact, Coleman admits running up to $6934.93 in bills, leaving his landlord holding two months' rent bill for $800, and taking out a $1932.94 loan from First State Bank and then defaulting on that loan without attempting to pay it back (Coleman Depo. at 47).   Soon thereafter, Sheriff Burke sent his letter to TCLEOSE, stating that "It is in my opinion that an officer should uphold the law.   Mr. Coleman should not be in law enforcement if he is going to do people the way he did this town."

19.   One month after being rejected by the Odessa Police Department, Coleman heard that Swisher County was looking for an undercover police officer and approached Sheriff Larry Stewart of Swisher County about the job (RR, Vol. 2 at 112). He was subsequently hired.

20.   On May 6, 1998, approximately five months after he was hired by the Swisher County Sheriff's Department, Coleman was charged with Theft and Abuse of Official Capacity in Cochran County.   Sheriff Kenneth Burke filed the charges after receiving eight letters from various local vendors all requesting assistance in collecting debts Coleman promised he would repay but never did. Without informing the Swisher County Sheriff's Department or the Panhandle Regional Narcotics Task Force (PRNTF), Coleman signed a Waiver of Arraignment on May 30, 1998, for these charges. He then hired an attorney in Cochran County to assist him in resolving the charges against him

---

[5]   
| | | |
|---|---|---|
| Q: | At the time you left Cochran County, had you been confronted by anyone at the Cochran County Sheriff's Department about this issue of whether or not you had stolen some   fuel? |
| A: | Nope. |
| Q: | When did you find out about that? |
| A: | Oh, gosh, sometime in . . . okay.  I don't understand the question. |
| Q: | When did you find out that you were being accused of . . . of obtaining fuel inappropriately from Wallace Oil Company? |
| A: | Okay.  Accused of? |
| Q: | Yes. |
| A: | Oh, probably in '97 or . . . yeah, '97, November . . . October, November, December, somewhere around there.   (Coleman Depo. at 43). |

(Coleman Depo. at 103).   The Cochran County charges threatened his entire career in law enforcement, and Coleman did not inform his current employers in Swisher County and Amarillo of these pending charges.  Instead, he pretended as though he had not been charged at all, and proceeded to work as a law enforcement officer.

### 3.     Swisher County: law enforcement officials failed to disclose Coleman's background even though they knew of his problems in Cochran County and elsewhere

21. The Sheriff of Swisher County, Larry Stewart, hired Agent Coleman for the specific purpose of working as an undercover agent for the PRNTF.   Swisher County had obtained federal funds for such an agent. District Attorney McEachern, Commander Michael Amos, head of the Amarillo PRNTF and Sergeant Jerry Massengill, member officer of the Amarillo PRNTF, and the Sheriff were responsible for the hiring of Agent Coleman.  Sheriff Stewart claims that he, Commander Amos, and Sergeant Massengill performed a background check on Agent Coleman, and that they found nothing (RR, Vol. 2 at 188).  Indeed, the Sheriff did not even locate the letter written by Sheriff Burke of Cochran County which was filed with TCLEOSE, though he claimed to have checked with this same agency to verify that Agent Coleman was a certified officer (Stewart Depo. at 74).   The Sheriff himself stated:

Q:     Did you check with any of the departments that he had previously worked for, not just Cochran County, but any of the other sheriff's offices, jailing situations, Denton County, any of those folks to . . .

A:     I did not. Like I said, I talked with the ranger [Larry Gilbreath, Texas Ranger, Brownfield], and I called TCLEOSE, first of all, to be certain that he was a certified officer.

Q:     All right.  And as we talked before, the fact that he's certified doesn't guarantee integrity or honesty, does it?

A:      But it's a requirement of the job.  I can't hire him unless he's certified.

[...]

Q:      Anybody else [besides Ranger Gilbreath]?

A:   I don't remember talking to anyone else.  I B it's possible I did, but I don't

remember talking to anyone else.  (Stewart Depo. at 73-74).

Though Ranger Larry Gilbreath informed Sheriff Stewart that Agent Coleman had some problems

in Cochran County, Sheriff Stewart never spoke with Agent Coleman's supervisor at his previous

position in the County, Sheriff Kenneth Burke, (Stewart Depo. at 66-67) or otherwise inquired

further into the alleged problems.  Agent Coleman was hired with few questions asked.

4.      **Coleman continued to engage in law enforcement activities even after the Cochran County charges were pending against him even though he was prohibited from doing so, and the Swisher County Sheriff's Department and District Attorney's Office knowingly concealed this fact**

22. Coleman continued to make alleged buys of narcotic substances even though he was

officially prohibited to do so while the charges in Cochran Country were pending against him.  Both

Commander Amos and Sheriff Stewart testified at the hearing in another case involving William Cash

Love, and said that Coleman could not perform his official duties, i.e. conduct alleged narcotics

transactions, until the charges against him were dismissed, and that if he did otherwise, he would have

been subject to criminal penalties:

Commander Amos

Q:   So by your testimony, Coleman was relieved of his duties from the time he discovered . . . or you discovered that there were charges until dismissed; is that correct?

A.   Yes, sir.

Q:   If he makes buys while he's suspended, knowing that he cannot work that job anymore, would he be guilty of possession of a controlled substance?

A:   That would be the case, yes, sir.  (Love's Mot. New Trial, p.35).

Sheriff Stewart

Q:   And Mr. Coleman was well aware, from you at least, that he was off duty, or relieved of duty, until this case was dismissed?

A:   I think so, yes, sir.  (Love's Mot. New Trial, Love, p. 48).

Q:   Commander Amos said that he was relieved of his duties in Swisher County undercover operation until this thing was resolved, being dismissed?

A:   I wouldn't argue with that.  That is correct, I think.

Q:   Is that correct?

A:   Yes, sir.  (Love's Mot. New Trial, pt. II, p. 13).

Q:   So basically, regardless of what you are told, as long as this complaint or information was pending in Cochran County, he could not work undercover here, according to you and Commander Amos, is that correct?

A:   I will agree with that.  (Love's Mot. New Trial, pt. II, p. 16).

13

From the time that Coleman was charged, May 6, 1998, to August 17, 1998, the date that the charges were dismissed because Coleman paid restitution to the vendors, he persisted in making alleged and illegal transactions.

23.  To compound matters, even after Sheriff Stewart, Commander Amos, and Sergeant Massengill learned that Coleman faced criminal charges in Cochran County, Coleman proceeded to make buys of cocaine which Sheriff Stewart and District Attorney McEachern knew were in direct violation of the Sheriff's orders and of the law, and which they never disclosed at trial. Sheriff Stewart and Commander Amos and Sergeant Massengill of the PRNTF had affirmative knowledge of these charges on August 7, 1998, at the very latest (Stewart Depo. at 77 - 83). This is the date on which the Sheriff received a teletype dated from the Cochran County Sheriff's Department advising Stewart that there was a warrant for Coleman for abuse of official capacity and theft (Stewart Depo. at 77). On August 10, 1998, Sheriff Stewart went to Amarillo and with Commander Amos, confronted Coleman about the charges. That same day, Sheriff Stewart arrested Agent Coleman (Stewart Depo. at 85), and bonded him out (Stewart Depo. at 82). Sheriff Stewart, Commander Amos, and Chief Neal of the Amarillo Police Department told Coleman that "he would not be working until he dealt with the warrant" (Depo of Stewart 83). Nonetheless, both the Sheriff and McEachern allowed these illegal, off-duty sales to form the basis for later prosecutions, and never disclosed these facts to defense counsel at trial.

24.  After he was "put on vacation," Coleman and his Cochran County attorney worked out a sweetheart deal with the prosecutor that went into effect on August 17, 1998: Coleman would pay back the money owed, close to $7,000, as restitution to the vendors in exchange for the charges being dropped and the vendors' promise not to pursue civil charges against Coleman. Though neither Sheriff Stewart nor the PRNTF verified that the Cochran County charges against Coleman had been dropped, he was put back on duty upon his return from Cochran County. (Stewart Depo. at 87 - 89).

14

25. None of these facts were ever disclosed to Mr. Williams or his attorney, or, on information and belief, to the other "sting" defendants. The State never disclosed the fact that Coleman's employment in Swisher County was suspended for a period during the eighteen months. Indeed, Sergeant Massengill affirmatively (and misleadingly) testified that he never had any problems with Agent Coleman during the term of his employment with the PRNTF and Swisher County (RR, Vol. 2 at 175-76) and that Coleman "abid[ed] by our procedures and rules and regulations" (RR, Vol. 2 at 175). Further, Commander Amos testified that Coleman was "a real exceptional officer. . . He followed orders like he was told to do" (RR, Vol. 2 at 183). Sheriff Stewart testified that Coleman was employed by Swisher County for a full eighteen months (RR, Vol. 2 at 191). No representative of the State ever disclosed the fact that Coleman made alleged transactions when he was formally off-duty, out of the county, and prohibited from doing so. District Attorney McEachern knew all of these facts before Mr. Williams's trial and actively suppressed them during Mr. Williams's trial.[6]

5. **Tulia Sting: the District Attorney suppressed all of the above information during trial; Swisher County law enforcement, Coleman and the PRNTF actively covered up the above facts and permitted prosecutions based on highly improper, possibly illegal investigative procedures**

---

6 Sheriff Stewart stated under oath that he alerted district attorney McEachern that he had received an arrest warrant on Agent Coleman at some point three or four years ago (Stewart Depo at 118):

Q.     Did you ever bring to the District Attorney McEachern's attention this warrant and problems that arose in Cochran County?
A:     Yes, sir, I did.
Q.     Tell me what you told the DA.
A·     I told him that we had an arrest warrant on the undercover officer
Q.     What was McEachern's response?
A:     Again, that's been three or four years ago, you know. I don't remember exactly how the conversation went.
[...]
Q.     Was he informed before the cases that Coleman was trying to make were presented to the grand jury?
A:     I believe he was, but again, I don't remember specifically at what point

McEachern had clear notice of the existence of the *Brady* material given that he had fought against the presentation of Coleman's employment records in court. On his recommendation, Judge Self sealed Coleman's employment records, declaring them not *Brady*

26. The basis for both the arrests made on July 23, 1999 in Tulia and the subsequent convictions were, in most cases, based solely on the uncorroborated testimony of Agent Coleman. Agent Coleman had never worked as an official undercover agent prior to being hired by the Swisher County Sheriff's Department (Coleman Depo. at 68 - 69). After Agent Coleman was hired, he received a two-week training by the Drug Enforcement Agency (DEA) in Houston (RR, Vol. 2 at 113). He was then observed on duty by more experienced undercover agents (Coleman Depo. at 70). Agent Coleman then spent the next eighteen months, including the period during which Coleman was formally off-duty and out of the county, making alleged buys in Swisher County. (RR, Vol. 2 at 75)

27. During these eighteen months, Agent Coleman allegedly made buys and sales almost exclusively with African Americans in Tulia. Agent Coleman did not wear a wire during any of the alleged transactions. (RR, Vol. 2, 119). No video surveillance was done, and no second officer was available to corroborate his reports (RR, Vol. 2, 146). In most of the cases, Coleman was the only state witness concerning the illegal transaction.

28. Coleman's testimony at the trials of Tulia arrestees was highly inconsistent and sometimes plainly false.[7] In some of the cases, including Mr. Williams', Coleman misled the jury about his marital status during the eighteen months he worked as deep undercover in Tulia, toward the goal of presenting himself as a stable, family man. (RR, Vol. 2 at 113). He also lied about whether he was randomly tested for drugs (RR, Vol. 2 at 153-54).

29. Additionally, defense attorneys in other cases found inconsistencies in Coleman's police reports. One of his reports had him making a buy in Tulia at 9:30 a.m. on September 28, 1998, then driving fifty miles from Tulia to Amarillo to file a report and log the drugs into evidence, and then

---

[7]
Q:   Now, you've given testimony in a number of cases?
A:   Uh-huh.
Q:   Yes?
A:   Yes.
Q:   Do you stand by the truthfulness of all of the testimony you gave?
A:   That can be questionable. It's B just depends on how hard B or how the defense attorney twisted the truth. I mean, I B I have read over my testimony, and B and some of that stuff in there is, like, totally out in left field. (Coleman Depo. at 152).

returning to Tulia to make another drug buy at 10:30 a.m. This is physically impossible. On April 9, 2002, District Attorney McEachern dismissed the charge against Tulia "sting" arrestee Tonya White after her defense counsel presented him with a bank record showing Ms. White to have made a transaction from a bank in Oklahoma at the time Coleman alleged she was selling him 1.3 grams of powder cocaine in Tulia, more than 300 miles away. Billy Wafer, a drug sting defendant whose employer and employment records showed him to have been at work at the time of the alleged drug transaction, was cleared. In another related case, Coleman described a 5'6" bald defendant by the name of Yul Bryant as a tall man with bushy hair. Coleman explained these inconsistencies in his trial testimony by stating that he wrote important details on his leg and stomach. Inconsistencies in his written notes he blamed on errors by his secretary, whom he directed to shred his original notes after transcribing them.

30. Ironically, months after the Tulia sting, and before most of the above information was publicized by investigative journalists, the Texas Narcotics Control Program named Coleman Officer of the Year and Regional Officer of the Year (Coleman Depo. at 183).

### f. After Tulia: Coleman's troubled history in law enforcement continues

31. After the Tulia sting, Coleman was hired to work undercover in Waxahachie, Ellis County. Coleman was soon after fired from that position for abusing his powers (Coleman Depo. at 172 - 181). When initially asked about why he left Ellis County, Coleman stated under oath that he left because of "probably a lot of negative publicity from Tulia" (Coleman Depo. at 172). Upon further questioning, he admits he lied and acknowledged that he left Ellis County after a complaint was filed against him by another officer (Coleman Depo. at 180). After Ellis County, Coleman was unemployed for several months. Coleman is currently working as a private investigator for Advantage Financial Corporation, a credit card company (Coleman Depo. at 181).

## GROUNDS SUPPORTING THE PETITION FOR RELIEF

**I.    THE STATE SUPPRESSED COPIOUS AMOUNTS OF EXCULPATORY AND IMPEACHMENT MATERIAL CONCERNING ITS KEY WITNESS, AGENT COLEMAN, AND OTHERS**

32. Mr. Williams was denied his right to due process and confrontation of the witnesses against him as guaranteed by the Fifth, Sixth, and Fourteenth Amendment to the U.S. Constitution; *see generally Brady v. Maryland*, 373 U.S. 83 (1963); *Davis v. Alaska*, 415 U.S. 308, 316 (1974).

33. The following includes but is not limited to the *Brady* material that was not disclosed to defense counsel at Mr. Williams's trial:

    1)    That during the eighteen months that Tom Coleman was employed by the Panhandle Regional Narcotics Trafficking Task Force and was working as an undercover agent in Swisher County, he was charged with two criminal offenses in Cochran County: Abuse of Official Capacity and Theft in Cause No. 5701 for buying gas for personal use of his car and charging it to the Cochran County Sheriff's Department;

    2)    That these charges affected Tom Coleman's status as an undercover in Swisher County; indeed he was suspended by the Panhandle Regional Narcotics Trafficking Task Force pending the resolution of the charges against him;

    3)    That the charges were filed after Cochran County Sheriff Burke received letters and affidavits from eight Cochran County vendors complaining that Agent Coleman owed money or left debts unpaid and after he discovered that Agent Coleman used official police money to pay for gas for his personal car;

18

4)  That Tom Coleman used his position as deputy sheriff in Cochran County to obtain loans from a bank, stating that because he is a police officer, he is to be trusted, and then defaulted on those loans without attempting to pay them;

5)  That Tom Coleman rented a home in Cochran County and left the home without paying the two months of rent money owed to the landlord;

6)  That the Sheriff of Cochran County, Kenneth Burke, wrote a letter to the state agency that licenses police officers, following Agent Coleman's departure from Cochran County stating, "It is in my opinion that an officer should uphold the law. Mr. Coleman should not be in law enforcement if he is going to do people the way he did this town."

7)  That Sheriff Stewart of Swisher County, and Commander Amos and Sergeant Massengill of the PRNTF all had affirmative knowledge of these charges prior to Jason Williams's arrest, as of at least August 10, 1998, which is the date on which the Sheriff went to Amarillo and with Lt. Amos confronted Coleman about the teletype dated August 7, 1998 from the Cochran County Sheriff's Department advising Stewart that there was a warrant for Coleman for abuse of official capacity and theft (Stewart Depo. at 77);

8)  That Sheriff Stewart arrested Agent Coleman on the 10th (Stewart Depo. at 85), and bonded him out (Stewart Depo. at 82);

9)      That Sheriff Stewart, Commander Amos, and Chief Neal told Agent Coleman that "he would not be working until he dealt with the warrant" (Stewart Depo. at 83);

10)     That Tom Coleman signed a Waiver of Arraignment on May 30, 1998 for these charges (Coleman Depo. at 104);

11)     That Tom Coleman had knowledge of his wrongdoing and potential repercussions as of <u>at least</u> the latter quarter of 1997 (Coleman Depo. at 43);

12)     That Tom Coleman borrowed and paid approximately $7,000 in restitution to resolve the Cochran County charges;

13)     That either Coleman did not inform his superiors about his pending charge until two and a half months after he had knowledge of the charges or that the Sheriff knew of these pending charges but allowed Coleman to continue to make buys and sells even though he was officially unauthorized to do so while the charges were pending;

14)     That even after the Sheriff clearly had knowledge of the charges pending against Coleman, Coleman proceeded to make buys and sells of cocaine even when he was unauthorized to do so because of his suspension;

15)     That Tom Coleman was not a married man during any of the trials resulting out of the sting despite what he testified to at Mr. Williams's trial. Thus, Agent Coleman blatantly lied to the court and the jury, and that the district attorney elicited and failed to correct the lie;

16)     That Eliga Kelly, a Tulia resident who was allegedly with Tom Coleman during the first transaction between Mr. Williams and Tom Coleman, was remunerated for his assistance with alcohol and occasionally cash.

34.  The non-disclosed materials paint a detailed and troubling portrait of a law enforcement officer who is thoroughly dishonest, repeatedly abused his authority and had often acted in violation of law. It is in sharp contrast to the image of Agent Coleman the prosecution presented to the jury B a very good and honest law enforcement officer.

35.  In this case, there is no dispute that Mr. Williams would not have been convicted of any crime if the jury distrusted or refused to credit Coleman's testimony.

36.  The suppression of this material renders Mr. Williams' guilty verdicts inherently unreliable and fundamentally unfair.

II.   **THE NONDISCLOSURE OF IMPEACHMENT EVIDENCE VIOLATED MR. WILLIAMS'S SIXTH AMENDMENT RIGHT TO CONFRONTATION BY PREVENTING MR. WILLIAMS FROM PUTTING ON A DEFENSE**

37.   Mr. Williams was denied his right to due process and confrontation of the witnesses against him as guaranteed by the Fifth, Sixth, and Fourteenth Amendment to the U.S. Constitution; *Davis v. Alaska*, 415 U.S. 308, 316 (1974).

38.   Defense counsel should have been permitted to expose to the jury the facts from which jurors, as sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the State's key witness. The accuracy and truthfulness of Agent Coleman's testimony were the key elements in the State's case against Mr. Williams. Indeed, the State's case was based entirely on Agent Coleman's testimony, and Mr. Williams's only available defense, without being forced to take the stand, was his ability to impeach the Agent's testimony to show that the Agent was not trustworthy nor reliable. There was, unfortunately, no other testifying witnesses to the alleged transactions, and Mr. Williams did not present an alibi defense. While Mr. Williams cannot know for certain whether the jury, as sole judge of the credibility of a witness, would have found Agent Coleman completely un-credible, the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on his testimony which provided the sole link in the proof of the allegations against Mr. Williams.

III.   **MR. WILLIAMS'S RIGHT TO DUE PROCESS OF LAW WAS VIOLATED WHERE THE STATE KNOWINGLY FAILED TO CORRECT AND EVEN ELICITED PERJURED TESTIMONY OF THE KEY WITNESS**

39.   Mr. Williams was denied his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution when the state knowingly failed to correct and even elicited perjured testimony of the key witness.

39a.  Coleman gave false testimony about why he left his position with the Cochran County Sheriff's Department. He testified that he resigned from the position "[b]ecause the sheriff [Sheriff Burke] was a crook" and because the sheriff "was using the law enforcement for personal gain." (RR, Vol. 2 at 145).  Coleman lied under oath by accusing Sheriff Burke of Cochran County of committing acts that in fact he had been charged with and for which there is solid proof.[8]  The district attorney knew that Coleman was giving false testimony, yet failed to correct it.  Instead, the district attorney allowed Coleman to present himself as an upstanding police officer who could not abide by misconduct even though Coleman was actually speaking of his own actions when he testified about using law enforcement for personal gain.

40.     Coleman told Mr. Williams' jury that he was a married man. This was false. At the time of his testimony, and indeed throughout his service in Swisher County, Coleman was not married. He had been divorced from his former wife since 1994. Nevertheless, this did not stop the prosecutor from asking Coleman whether he was married or from Coleman answering that he was. RR Vol.2 at 113.

41. Coleman also testified that he was randomly tested for drugs throughout the eighteen months he worked in Swisher County. (RR Vol. 2 at 153-54). He has since admitted under oath that this trial testimony was false. At the time he gave this testimony, the prosecutor knew it to be false yet did not ask Coleman to retract it.

42.  These misleading and false assertions allowed the prosecution to cast Coleman in a false light. The trial verdict is fundamentally unfair as Coleman's credibility was critical to the jury's finding Mr. Williams guilty beyond a reasonable doubt.

---

[8]Affidavits of vendors exist that state how much money Coleman owed them and for what transaction.

## IV. THE PROSECUTOR IMPROPERLY COMMENTED ON MR. WILLIAMS'S EXERCISE OF HIS FIFTH AMENDMENT RIGHT NOT TO TESTIFY

43. Mr. Williams was denied his right to due process and privilege against self-incrimination as guaranteed by the Fifth, Sixth, and Fourteenth Amendment to the U.S. Constitution; *Griffin v. California*, 380 U.S. 609 (1965).

44. Immediately after the defense rested its case without presenting any witnesses, District Attorney McEachern made the following statement in his opening summation: "The Defense exercised their right not to put on any evidence. That's their right. He's presumed to be evidence –presumed to be innocent" (RR, Vol.2 at 208). The district attorney's comment cannot be interpreted as a mere failure of the defense to counter evidence presented by the prosecution because there was no one other than Mr. Williams who could have offered contrary evidence. Any statement uttered by the district attorney about how Mr. Williams exercised his right not to put on a case is a direct reference to the fact that Mr. Williams opted not to testify, which violates *Griffin*. Examining the prosecutor's remark in context, it is readily apparent that the jury in Mr. Williams's would naturally and necessarily have interpreted the prosecutor's remarks as a comment on Mr. Williams's failure to testify in the guilt phase of his trial.

## V.      THE PROSECUTOR ENGAGED IN OTHER SERIOUS MISCONDUCT

45. Mr. Williams was denied his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution when the district attorney made improper arguments to the jury.

a) Misconduct During Voir Dire

46. The prosecutor used voir dire as a device to improperly influence the panel to be unfairly partial to the state and predisposed to convict. In Mr. Williams's case, the first part of voir dire occurred on January 11, 2000. On this day, another defense attorney, Angela French, conducted voir

24

dire in another "sting" case – that of Christopher Eugene Jackson but the same venire minus the actual

jurors who served in Mr. Jackson's trial were present on January 13, 2000 for Mr. Williams's voir

dire. Mr. Hukill was unable to attend the January 11 voir dire (RR, Vol. 2 at 42). A few of the

prosecutor's improper arguments to the jury occurred outside of Mr. Hukill's presence during Mr.

Jackson's voir dire, but because this was the same venire out of which Mr. Williams's jurors were

picked, the prosecutor's misconduct is relevant to petitioner's Application.

### 1) Improper Invocation of Prosecutorial Oath

47.     He told prospective jurors, "I've taken a sworn duty to see that justice is done. If you

don't think I do my job, find him not guilty."

### 2) Improper Unsworn Testimony

48.     The prosecutor proffered unsworn testimony during voir dire that went to the heart of

the evidence  – or lack thereof – in the state's case. The district attorney injected his own opinions and

testimony during voir dire which were not proofed up or established at trial though a proper, sworn

state witness.  Though the district attorney did indeed have cause for concern that a jury would have

a reasonable doubt about Mr. Brookins guilt given the inconsistency of the state's evidence and the

utter lack of credible inculpatory testimony from a state witness, he improperly and unconstitutionally

influenced the venire with his own opinions:

- "[S]o many crimes can occur with just one witness . . . [including] delivery of cocaine."
  (Christopher Jackson's Reporter's Record (CJRR) at 24).

- "[W]e're not going to have any videos. In my history as District Attorney, I might have two
  or three videos of a crime."  (CJRR at 25).

- "99.9 percent of the cases don't have fingerprints. That's what you see on TV.  This is
  reality." (CJRR at 25).

- "So, can you see there will be inconsistencies?" (CJRR at 27).

- "Not beyond all doubt, not beyond a shadow of a doubt, because we are not going to have video cameras and stuff like that." (RR, Vol. 2 at 33).

- "I submit to you there will be inconsistencies the same as I told you before, the same as has been in every case. And remember when I went down the row over here and we had a few different sitting here on this row? I know Mrs. Weiser was the first one on the row. And I said we had red here, black here, dark green here, blue here, and then we had white with Mrs. Weiser. But you all saw the same thing. Remember when I talked about that?" (RR, Vol. 2 at 33) (referring to voir dire conducted in advance of Mr. Jackson's trial where the district attorney presented this example and then asked, "So, can you see there will be inconsistencies?").

49.     This unsworn testimony from the district attorney is completely improper.   No evidence was offered in its support during Mr. Williams's trial.   The district attorney attempted improperly to fill in evidentiary gaps in Mr. Williams's case with his own opinions introduced through unsworn testimony.

50.   Moreover, the prosecutor materially and prejudicially misstated the state's burden of proof during voir dire.   In response to defense counsel's statement that "it's not accusations alone that sends someone to a prison or to a jail," (CJRR at 37), the prosecutor made the following chilling and unconstitutional assertion:   "If you just take accusations [by the state] together with reputation [of the defendant] it may be enough and it may not . . ." (CJRR at 37).   That statement flatly misstates the law. The presumption of innocence and requirement of proof beyond a reasonable doubt are underpinned by the fundamental principle that the state's mere allegations coupled with a defendant's reputation are never enough to sustain a conviction.

### 3) Improper Commitment Questions

51.     The district attorney further violated Jackson's rights by requiring prospective jurors to pledge that they: (1) could convict defendant on the testimony of a single witness; and (2) could convict defendant in the face of inconsistent evidence. (CJRR at 24-27). Through improper "commitment questions," the prosecutor improperly predisposed jurors to assess evidence in a in a way that favored the state before the evidence was even introduced.

52.     After belaboring his improper testimony that "so many crimes can occur with just one witness," the district attorney finally asked jurors flat out to accept the proposition that they could convict Jackson on the testimony of a single witness. (CJRR at 24-25). His phraseology, "Could you make a decision based on one witness," (CJRR at 25), is a classic improper question. His question, "So, can you see that there will be inconsistencies?" (CJRR at 27) was likewise improper.

### b)     Misconduct During Guilt/Innocence Phase Closing Statement

53.     During his closing argument, the district attorney reminded jurors of his unconstitutional arguments during voir dire. He said, "I also told you that if you were B if you relied upon one witness, you could, and you believed that witness was a credible witness, based on the facts, you can convict. And you, each one and everyone of y'all, told me that you could." (RR, Vol. 2 at 208).

54.     The prosecutor also made several statements during his closing argument that were never established under sworn testimony during the trial and which were highly inflammatory:

- "And did you know that right now, as you twelve people sit there, that this as close, thank goodness, as you will have to come to the most deadly product that's ever been developed in our nation, in my opinion?" (RR, Vol. 2 at 209).

- "This is a rattlesnake. It is a venom. It is something that will kill you. And it does not

matter if it's a small amount or a large amount." (RR, Vol. 2 at 209).

- "And I give you this: If somebody were to come steal my pickup, and I saw his face, and I didn't know his name, but I later saw a picture of him that told me who it was, wouldn't I know to identify the picture?" (RR, Vol. 2 at 210).

- "Where you only got one witness. And you have to rely upon that one witness, so you have to look at the credibility. Does it make sense? I personally think you couldn't do what Tom Coleman did and go into the den of iniquity, into the pits with the snake. But if I can find Certified Peace Officers in good standing with the State of Texas to do it, I'll do it." (RR, Vol. 2 at 211).

    c)    Misconduct during Punishment Phase Closing Argument

55.    The district attorney proceeded to make highly inflammatory and improper remarks during his punishment phase closing argument that were not established under sworn testimony during trial:

- "I still feel the same way today as I did yesterday about that dope laying on that table, that dope known as cocaine, that it's a snake, and that if I have control whatsoever on helping to axe off the head of that snake, I am going to do it, luckily assisted by the help of some of the men sitting in this room, the Chief, the Sheriff, and undercover agents that will be here." (RR, Vol. 3 at 61).

- "But let's get honest. I want to know who's selling drugs, and he won't even answer that from the stand. He will not acknowledge it. He says that he has never seen cocaine, but he admits to being around it. He's not being honest with you. Let's get honest. Let's call it what it is. Let's call a snake, a snake." (RR, Vol. 3 at 68).

- "I submit to you, ladies and gentlemen, this is the most powerful weapon, more powerful than what we said and heard on TV, than a speeding bullet, and can hurt you worse than anything that you ever dreamed of in your entire life, and will hurt people. And if that's not a weapon, then so be it." (RR, Vol. 3 at 69).

## VI.    MR. WILLIAMS'S RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL

56.    Mr. Williams did not receive effective assistance of counsel at trial in violation of his Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution; *Strickland v. Washington*, 466 U.S. 668 (1984). Mr. Williams's conviction must be vacated because trial counsel failed to provide him with effective assistance of counsel. Trial counsel made multiple, prejudicial errors at critical junctures before and during the trial, and thus failed to give Mr. Williams's any meaningful adversarial process. His omissions and errors included, but are not limited to, the following:

a)    Failure to investigate

57.    Trial counsel failed to uncover damaging information about Coleman that he could have used to challenge Coleman's credibility. Given that Coleman was the only inculpatory witness for the state, the failure to conduct any investigation into Coleman's background is particularly prejudicial and cannot be justified by any trial strategy. Trial counsel failed, among other things, to uncover Sheriff Kenneth Burke's letter about Coleman which was filed with a public agency and which would have been uncovered from a basic public records search. This letter would have given trial counsel some indication of Coleman's misconduct in Cochran County, and may have possibly led to some basic knowledge about Coleman's arrest during the eighteen months he was employed in Cochran County. Given the level of publicity around the "Coleman sting," trial counsel should have investigated into the administration behind the "sting" and Coleman's training prior to working in Swisher County. Trial

counsel should have interviewed Sheriff Stewart, Commander Amos, and Sergeant Massengill about how Coleman was hired and how he was or was not trained and supervised throughout his employment in Swisher County.

        b) Failure to file a motion to suppress the alleged identification or to object to inflammatory testimony about the alleged identification

58.    Trial counsel failed to file a motion to suppress Coleman's highly questionable and suggestive identification of Mr. Brookins. The district attorney never turned over a photograph of Mr. Brookins. Further, trial counsel never insisted that a photograph be admitted into evidence. Trial counsel never challenged Coleman's identification "procedure," which was highly questionable.[9] Further, the Sheriff testified that Coleman would give the Sheriff a name, and if the Sheriff had a record on that individual, he would obtain a book-in photo and show it to Coleman.[10] Such testimony was highly prejudicial because it indicated that the photos that the Sheriff had were of individuals who

---

[9]

| | |
|---|---|
| Q: | . . .My question is: How did you confirm or satisfy yourself, after you made that transaction, that that was Jason Williams? |
| A: | Okay, I went to the truck stop. After I dropped off Eliga Kelly, I went to the truck stop and got on the pay phone and called Linda and said, "Hey do you know anybody by the name of Jason Williams?" She said, Let me look it up." She looked it up. And she said, "Yes." I said, "Do you have a picture on him?" And she said, "Yes." I said, "I need you to meet me somewhere and show me the picture." |
| Q: | You sure you went to the truck stop? |
| A: | I'm pretty sure. I've been a bunch of places. You have to be real careful where you use the phone. |
| Q: | I understand that. And that's . . . But that you went to the turck [sic] stop is not in your report, is it? |
| A: | No. I mean I may have went to B I had to make contact with the Sheriff's Office, have to be careful about it. |
| | . . . |
| Q: | But you don't know in this case where you went and made the phone call, do you? |
| A: | That's true. Well, it was around here close. |
| Q: | And then your identification of Mr. Williams to the other transactions was basically based on B on B on your identification in this case. Is that true? |
| A: | Yes. I knew him then. (RR, Vol. 2 at 147-49). |

[10] Sheriff Stewart's testimony: "Generally, Tom would call us and tell us that he had made a buy from an individual, give us a name or ask us if we knew a certain individual or certain individuals. We would go to our records, and if we had a record on that individual, and obtain a book-in photo, and make a copy of it, and then give it to him so he could look at the phot [sic] to see if it matched the person that he had made the buy from." (RR, Vol. 2 at 188).

30

had been arrested at least once before (RR, Vol. 2 at 188).  Trial counsel failed to object to such testimony.

        c)      Tainting of venire pool by asking questions that would elicit prejudicial and inflammatory remarks about perceptions of Tulia's drug problem.

59.      Trial counsel poisoned the well by asking the venire as a group about a perceived drug problem in Tulia and about whether.  He told the venire, AI want to ask you as a group, do you believe that there's a drug problem in Tulia, Swisher County, Texas?  If you believe that there is, I would like to see a show of hands. . ." (RR, Vol. 2 at 66).  For the next few pages of the record, only venire members who believed that Tulia had a drug problem commented in front of the entire venire about why they perceive that Tulia has a drug problem (RR, Vol. 2 at 66-68; 71-76).  Moreover, trial counsel asked one member, in front of the whole venire, "Do you believe, then, that anybody that was involved and picked up in that sting must be guilty, because those guys you think were?"  The venireperson answered, "I know three of them are." (RR, Vol. 2 at 78).  Such questions and answers, conducted before the entire venire, improperly tainted all the members' minds, some of whom may have been undecided, about this issue.

60.      Furthermore, trial counsel failed to object when Coleman testified using inflammatory language that his job in Swisher County was to "be a part of the community where, you know, <u>the drug cartel</u> could see me" (RR, Vol. 2 at 114) (emphasis added).

        d)      Failure to object to instances where the District attorney improperly testified to facts while conducting direct examinations of state witnesses

61.      Trial counsel failed to object when the district attorney improperly introduced testimony as an unsworn witness through his questions on direct to elicit certain responses by his witnesses.  For example, on the question of whether Mr. Williams allegedly sold Coleman drugs within 1,000 feet of Conner Park on two occasions - allegations which resulted in enhanced sentences of 8 and 45 years for

Mr. Williams – the district attorney led Coleman by asking him, "Two of them close to a park?" Coleman responded, "Yes, sir." (RR, Vol. 2 at 134). This is the only evidence in the record of facts which "support" the enhancement. Trial counsel did not object to such leading testimony nor to the insufficiency of evidence which led to two of Mr. Williams's sentences being enhanced.

        e)    Failure to object to Coleman's reading of notes on the stand and failure to examine Coleman's notes

62.    On three different occasions, trial counsel failed to object to Coleman's reading of notes on the stand and further failed to examine the notes to investigate by whom they were written, when they were written, and why they were written (RR, Vol. 2 at 115-116, 144-45).

        f)    Failure to point out inconsistencies between Coleman's testimony and that of another witness regarding the important fact of Coleman's drug testing

63.    Trial counsel failed to highlight inconsistencies between Coleman's testimony that he was randomly tested for drugs between three and four times a week (RR, Vol. 2 at 154), and that of Sergeant Massengill who testified that Coleman was never randomly tested for drugs, but that he was screened for drugs approximately five to six times in the course of a year and a half (RR, Vol. 2 at 176). Such significant inconsistencies, combined with the fact that Coleman had to read from his notes to remember anything, render his testimony highly uncredible.

64.    But for these omissions and errors, there is a reasonable probability that the jury would not have convicted Mr. Brookins of any crime.

## VII.   TRIAL COUNSEL WAS INEFFECTIVE DURING MR. WILLIAMS'S MOTION FOR NEW TRIAL AND APPEALS PROCESS

65.    Mr. Williams did not receive effective assistance of counsel during his Motion for New Trial and his appeals process in violation of his Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution; *Strickland v. Washington*, 466 U.S. 668 (1984). Mr. Williams's conviction must be vacated because post-trial and appellate counsel failed to provide him with effective assistance of counsel. His omissions and errors included, but are not limited to, the following:

a) Failure to competently advocate for Mr. Brookins's right to cross-examine state's central witness during hearing on Motion for New Trial

65.     Though trial counsel correctly filed for a Motion for New Trial, given the importance of the impeachment evidence that the district attorney never disclosed about Coleman before or during Mr. Williams's trial, he failed to advocate for his client's right to confront the state's star witness with this evidence - evidence that is admissible under both the state evidentiary rules, and state and federal constitutional law.  Trial counsel was unprepared to argue for a new trial and appears to have done little legal research about why the district attorney had a duty to disclose this information and why Mr. Williams needs a new trial given that his constitutional rights under the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution and Article I, Sections 10 and 19 of the Texas Constitution were violated at trial.

b) Failure to file proper appeal, particularly after hearing on Motion for New Trial

66.     Furthermore, appellate counsel proceeded to file an *Anders* brief despite knowledge that the district attorney actively suppressed *Brady* material at Mr. Williams's trial. The filing of an *Anders* brief prejudiced Mr. Williams and undermined his very serious claim of prosecutorial misconduct before the 7th Court of Appeals.

## VIII. THE STATE'S EVIDENCE WAS INSUFFICIENT TO SUPPORT MR. WILLIAMS'S CONVICTION

67.     Mr. Williams right to due process as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution; *Jackson v. Virginia*, 443 U.S. 307 (1979).  As stated above, Mr. Williams was sentenced to 45 years (the maximum sentence he received out of the four)  in a Texas state prison on the basis of the allegations and testimony of a single police officer whose veracity has been proven to be highly suspect. At trial, Coleman's identification of Mr. Williams was not corroborated in any way.  Coleman, the sole eyewitness against Mr. Williams, did not even take contemporaneous notes about the alleged drug purchases other than information purportedly written on his leg that was never seen by anyone (except Coleman).  The lack of corroborating evidence, forensic or otherwise, presented combined with the testimony of the only inculpatory witness, a police

33

officer whose credibility is seriously in question, was insufficient as a matter of due process to sustain his conviction.  Thus, Mr. Williams's conviction must be vacated.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Mr. Williams prays that (1) he be permitted a reasonable time, to amend this petition and to move for necessary discovery, (2) that a hearing be set at a time convenient for both parties and the court after the court has granted discovery, (3) that his convictions and sentences be set aside, and (4) he be awarded a new trial.

Respectfully submitted,

Jeff Blackburn
Attorney at Law
State Bar No. 02385400
718 W. 16th St.
Amarillo, TX 79102
(806) 371-8333

George H. Kendall
Vanita Gupta
NAACP Legal Defense &
 Educational Fund, Inc.
99 Hudson St., Suite 1600
New York, NY 10013
(212) 965-2267

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing petition was served upon the Office of the Attorney General of Texas the 4th day of October, 2002, by first class mail at the addressed listed below:

Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711

Jeff Blackburn
Attorney at Law

35

## **VERIFICATION**

**BEFORE ME,** the undersigned authority, on this date personally appeared JEFF BLACKBURN, who, being by me duly sworn, did depose and state upon his oath as follows:

"My name is JEFF BLACKBURN. I am the Applicant's Attorney in the above entitled and numbered cause. I have read the foregoing Application for Writ of Habeas Corpus. It is true and correct ".

JEFF BLACKBURN

**SUBSCRIBED AND SWORN TO** before me this 4ᵗʰ day of October, 20 02

Notary Public in and for
The State of Texas

VIRGINIA SKIDMORE
Notary Public, State of Texas
My Commission Expires 08-06-03